**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5665-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KALIL J. GRIFFIN, a/k/a
DARNELL WILLIAMS,
KAHLIL GRIFFIN, and
KAHALIL GRIFFIN,

     Defendant-Appellant.

_____

Submitted November 6, 2019 – Decided December 17, 2019

Before Judges Accurso, Gilson, and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 12-05-0857.

Joseph E. Krakora, Public Defender, attorney for appellant (John A. Albright, Designated Counsel, on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Maura Kathryn

Tully, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

R.C. was shot twice in the head and left dead in his apartment.[1] Defendant Kalil Griffin was indicted for four crimes related to the murder of R.C. A jury convicted defendant of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree armed robbery, N.J.S.A. 2C:15-1; second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). Defendant was sentenced to an aggregate prison term of fifty years, with a period of parole ineligibility as prescribed by the No Early Release Act, N.J.S.A. 2C:43-7.2 (NERA). Defendant appeals from his convictions and sentence. We affirm.

I.

On February 21, 2011, the victim, R.C., was found dead in his apartment in Asbury Park. A doctor with the County Medical Examiner's Office later performed an autopsy and recovered two .38 caliber bullets lodged inside R.C.'s head and neck. The medical examiner opined that R.C. died as a result of wounds from two gunshots fired at R.C.'s head at close range. The medical

---

[1] We use initials for the victim and certain witnesses to protect their privacy interests.

examiner also opined that R.C. had died sometime between the evening of Friday, February 18, 2011, and the early morning of Saturday, February 19, 2011.

On February 18, 2011, defendant and co-defendant Joshua Simmons were seen by defendant's former girlfriend and her husband leaving R.C.'s apartment building at approximately 11:15 p.m. Defendant and Simmons had a garbage can with them. Law enforcement personnel later found the garbage can by a dumpster in a lot adjacent to R.C.'s apartment building. The can contained a computer and an examination of the computer showed that it had been subject to a "hard shut down," consistent with being unplugged, at approximately 10:36 p.m. on February 18, 2011.

Approximately a week after the murder, defendant and Simmons were arrested. Simmons and defendant both agreed to waive their Miranda[2] rights and be interviewed by law enforcement personnel.

Simmons provided two statements to law enforcement personnel, which were video recorded. In his first statement, given on February 24, 2011, Simmons initially denied being in Asbury Park on the night of the murder.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

Simmons, thereafter, admitted to being at R.C.'s apartment building and sitting on the stairs while defendant went into R.C.'s apartment to buy marijuana.

In his second statement, given the following day, Simmons made additional admissions. Simmons explained that he initially stayed outside the apartment as the "look out guy" while defendant went into the apartment. Thereafter, Simmons heard two "pops" and he entered R.C.'s apartment, saw that R.C. had been shot and was lying on the floor, and he and defendant searched for money and drugs.

Simmons also told detectives that he had seen defendant with a gun approximately one day before they went to R.C.'s apartment. He explained that defendant had shown both him and a neighbor, D.C., a gun in the hallway of the apartment where Simmons and D.C. lived. Simmons went on to state that defendant had pulled that gun out of a book bag or backpack and that when they went to R.C.'s apartment, defendant had that bag with him.

Defendant gave a statement to the police on February 25, 2011. He admitted going to R.C.'s apartment with Simmons on February 18, 2011, to buy marijuana from R.C. Defendant denied shooting R.C. He also stated that he and R.C. had "wrestled around a little bit." Further, he contended that R.C. had asked him to take his computer out to the trash because it was broken.

4

In May 2012, a grand jury indicted defendant and Simmons for four crimes related to the murder of R.C. As noted earlier, they were charged with felony murder, armed robbery, and two weapons offenses.

Before the return of the indictment, defendant filed a motion seeking to dismiss all charges against him, contending that his right to a speedy trial had been violated. On June 8, 2012, the trial court denied that motion.

Thereafter, the case went through extensive pretrial proceedings. During that time, defendant filed a number of pretrial motions, including a motion to suppress evidence seized from the crime scene and his home. Defendant also moved to suppress the statements he had made to law enforcement personnel. In November 2013, the trial court entered orders denying defendant's motion to suppress evidence and granting the State the right to use defendant's recorded statement at trial.

The State also engaged in extensive plea negotiations with Simmons. In September 2013, Simmons agreed to plead guilty to certain crimes and to provide testimony against defendant. Later, however, Simmons successfully moved to withdraw his guilty pleas.

In 2014, defendant again moved to dismiss the charges against him on speedy trial grounds. On August 14, 2014, the trial court denied that motion.

In January and February of 2015, Simmons was tried on charges related to the murder of R.C. A jury acquitted Simmons of felony murder and the weapons offenses, but convicted him of the lesser-included offense of theft. Subsequently, Simmons pled guilty to several unrelated crimes, and agreed to testify against defendant.

In October 2015, defendant was tried on charges related to the murder of R.C. At trial, the State presented testimony from a number of witnesses, including Simmons and D.C. The State also played portions of the recorded statements of defendant and Simmons.

Simmons testified that on February 18, 2011, he and defendant went to R.C.'s apartment so that defendant could purchase marijuana. After entering the apartment building, Simmons stayed outside the apartment, sitting on the stairs as a look out, while defendant went into R.C.'s apartment. While waiting on the stairs, Simmons heard "two pops." Defendant then came out of R.C.'s apartment and signaled Simmons to come inside. When Simmons got into the apartment, he saw R.C. lying on the floor with a bullet hole in his head. Defendant told Simmons that R.C. had "made him mad" so defendant had shot R.C twice.

Thereafter, defendant and Simmons searched R.C.'s apartment looking for money and marijuana. Defendant also suggested that they take R.C.'s computer

A-5665-16T4

out of the apartment in a trash can to make it look as though they were taking out the trash.

Consistent with the testimony by Simmons, D.C. testified that defendant had shown him and Simmons a revolver. D.C. explained that defendant had pulled the gun out of a bag. The State also presented evidence that they had found a backpack at defendant's apartment.

The State never found the murder weapon. At trial, a ballistics expert testified that the two bullets recovered from R.C.'s body were both fired from the same gun. The State argued that because police did not recover shell casings at the murder scene, the murder weapon was more likely to be a revolver rather than a semi-automatic handgun.

After hearing all the evidence, the jury convicted defendant on all four charges. Shortly after trial, an alternate juror contacted defense counsel claiming that during trial, several jurors had met to discuss the case. Defense counsel moved for a hearing on the alleged juror misconduct. The trial court determined that it would interview two of the alternate jurors. We, however, granted the State's emergent application for leave to appeal and held that there was no good cause for the court to interview those alternate jurors. State v. Griffin, 449 N.J. Super. 13, 19 (App. Div. 2017).

A-5665-16T4

At the August 2017 sentencing, the court granted the State's motion for an extended term and, on the conviction of felony murder, sentenced defendant to fifty years in prison, during which defendant would be ineligible for parole for eighty-five percent of that time as prescribed by NERA. The court merged the weapons convictions into the robbery conviction, and sentenced defendant to a concurrent prison term of twenty years, subject to NERA.

II.

On this appeal, defendant challenges his convictions and sentence on six grounds. Specifically, defendant articulates his arguments as follows:

> POINT I – "OTHER CRIMES" EVIDENCE THAT, BEFORE AND AFTER THE SHOOTING IN QUESTION, DEFENDANT POSSESSED WHAT MIGHT HAVE BEEN A REVOLVER SHOULD HAVE BEEN EXCLUDED UNDER N.J.R.E. 404(B); THE STATE DID NOT RECOVER A GUN, THERE WERE NO EYEWITNESSES TO THE SHOOTING TO IDENTIFY THE GUN, AND ITS EXPERT COULD NOT ESTABLISH THE TYPE OF HANDGUN USED IN THE SHOOTING, WHICH NECESSARILY SHOULD HAVE EXCLUDED IT FROM THE JURY'S CONSIDERATION ON THE ISSUE OF IDENTITY OF THE SHOOTER.
>
> POINT II – THE TRIAL COURT'S ERROR IN FAILING TO APPLY N.J.R.E. 404(B) TO THE VARIOUS WITNESS ACCOUNTS OF DEFENDANT'S POSSESSION OF A GUN RESULTED IN GROSSLY INADEQUATE JURY

INSTRUCTIONS WHICH DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT III – SIMMONS' STATEMENTS VARIED WILDLY FROM HIS INITIAL ASSERTIONS OF NO INVOLVEMENT WHATSOEVER TO THAT HE WAS ACTING AS A LOOKOUT WHILE DEFENDANT COMMITTED THE OFFENSES; THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON THE PERMISSIBLE USE OF SIMMONS' PRIOR CONTRADICTORY STATEMENTS DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT IV – DEFENDANT'S CONSITUTIONAL RIGHT TO A SPEEDY TRIAL WAS VIOLATED BY A THREE-AND-A-HALF YEAR DELAY THAT WAS NOT ATTRIBUTABLE TO HIM, AFTER HE ASSERTED HIS RIGHTS ON MULTIPLE OCCASIONS, AND SUFFERED RESULTING PREJUDICE.

POINT V – JUROR MISCONDUCT LIKELY PREJUDICED DEFENDANT'S RIGHT TO A FAIR TRIAL, AND GOOD CAUSE EXISTED TO INTERVIEW JURORS POST-VERDICT.

POINT VI – THE FIFTY-YEAR DISCRETIONARY EXTENDED TERM SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE AND AN ABUSE OF THE LOWER COURT'S DISCRETION.

Having considered each of these arguments in light of the law and record, we reject defendant's contentions. We will address defendant's first two arguments together and then analyze the remaining arguments in the order they were raised by defendant.

A-5665-16T4

A.    Testimony Concerning the Gun

Defendant argues that the trial court erred in allowing Simmons and D.C. to testify that defendant showed them a revolver the day before the murder and robbery. In that regard, defendant contends that the trial court failed to conduct an analysis under Rule 404(b), that a proper analysis under that rule would have excluded the testimony, and that the trial court compounded those errors by not giving a limiting instruction. We disagree.

"A trial court's ruling on the admissibility of evidence is reviewed on appeal for abuse of discretion." State v. Rose, 206 N.J. 141, 157 (2011). Unless a trial court commits a "clear error of judgment" we will not reverse based on such an evidentiary ruling. Id. at 158 (quoting State v. Barden, 195 N.J. 375, 391 (2008)).

Our Supreme Court has established a distinction between intrinsic evidence and evidence of other crimes, wrongs, or bad acts. Id. at 180. Evidence is intrinsic if it (1) "directly proves the charged offense"; or (2) "facilitates the commission of the charged crime" because it was performed contemporaneously with the charged crime. Ibid. (quoting and citing United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010)).

10                                                      A-5665-16T4

If evidence is intrinsic to the charged crime, there is no need to engage in an analysis under Rule 404(b) because the evidence is not being admitted as evidence of other crimes or bad acts; rather, it is being admitted to prove the charged crime. Id. at 177-78. "Thus, evidence that is intrinsic to a charged crime need only satisfy the evidence rules relating to relevancy, most importantly the [Evidence] Rule 403 balancing test." Ibid.

The trial court addressed this issue at a pretrial conference and ruled that the testimony of Simmons and D.C. that defendant had shown them a gun was intrinsic evidence. We discern no error or abuse of discretion in that evidentiary ruling.[3]

Simmons and D.C. testified that the day before the robbery and murder defendant had shown them a gun, which they described as a revolver. Both witnesses also testified that defendant had that gun in a book bag or backpack. Significantly, Simmons also testified that defendant had that bag with him when he went to R.C.'s apartment on February 18, 2011.

---

[3] The State contends that defendant waived the argument as to Simmons. In support of that position, the State relies on statements made by defense counsel. We do not read those statements as limiting defendant's objection to the admissibility of the evidence concerning the gun. Therefore, we reject this argument by the State.

Consequently, the testimony concerning the gun was intrinsic to both the murder and robbery charges. That defendant possessed a gun the day before the murder was directly relevant to whether he had a gun when he was in R.C.'s apartment the next day. Moreover, applying the balancing test called for under Rule 403, such testimony was relevant to both the crime of murder and robbery and was not substantially more prejudicial than probative. "The mere possibility that evidence could be prejudicial does not justify its exclusion" under Rule 403. State v. Brockington, 439 N.J. Super. 311, 333 (App. Div. 2015) (quoting State v. Long, 173 N.J. 138, 164 (2002)). Instead, the probative value of the challenged evidence must be "so significantly outweighed by its inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case." State v. Wakefield, 190 N.J. 397, 429 (2007) (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)).

As defendant notes, the murder weapon was not recovered by law enforcement personnel. Consequently, the State argued that it was significant that both Simmons and D.C. described the gun in defendant's possession as a revolver. No shell casings were recovered from the scene of the murder at R.C.'s apartment. The State's ballistics expert explained that shots fired from a

revolver do not discharge shell casings. In contrast, shots fired from a semi-automatic handgun would discharge shell casings. That testimony further illustrates that the testimony that defendant possessed a revolver was intrinsic to the crimes of murder and robbery.

Given our agreement with the trial court that the testimony was admissible, the trial court did not err in not conducting a balancing analysis under Rule 404(b). See State v. Cofield, 127 N.J. 328, 338 (1992) (setting forth a four-part test to determine if evidence of other crimes, wrongs, or bad acts is admissible). Nor did the trial court err in not giving a limiting instruction concerning the use of the evidence.

B.    Simmons' Statements

Defendant argues that the trial court erred when it did not instruct the jury that prior statements made by Simmons could be used as substantive evidence. Specifically, defendant contends that Simmons' statements to law enforcement officers at the time of his arrest were contrary to the testimony he gave at trial and, therefore, were relevant to both his credibility and disputed issues of material fact. In that regard, Simmons initially told the police he was not involved and, thereafter, his statements evolved in the details he recalled.

13

At trial, defendant did not request the model instruction on a prior contradictory statement by a witness. Accordingly, we review this issue for plain error. State v. Funderburg, 225 N.J. 66, 79 (2016). Plain error in a jury charge occurs when the substantive rights of a defendant are prejudiced and the violation is sufficiently grievous to convince us that the error itself possessed a clear capacity to bring about an unjust result. State v. Camacho, 218 N.J. 533, 554 (2014).

In reviewing a claim of error relating to a jury charge, "[t]he charge must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005) (citing State v. Jordan, 147 N.J. 409, 422 (1997)). In addition, the error "must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

The model jury charge concerning a prior contradictory statement made by a witness instructs the jury that it may consider a witness' prior inconsistent statement both "in judging a witness' credibility" and "as proof of the truth of what [was] stated in the prior contradictory statement." Model Jury Charges (Criminal), "Prior Contradictory Statements of Witnesses (Not Defendant)" (rev. May 5, 1994). While the trial court here did not give that charge, the court

did instruct the jury on how to evaluate all witnesses' credibility, including the evaluation of inconsistencies. In that regard, the trial judge specifically instructed the jurors that they were the judges of credibility and in evaluating credibility, they should consider "whether the witness made any inconsistent or contradictory statements . . . ." Consequently, a review of the entire jury charge establishes that the trial court did not commit plain error in not giving the specific charge concerning a prior contradictory statement by Simmons. See State v. Hammond, 338 N.J. Super. 330, 342 (App. Div. 2001) (explaining that a general credibility instruction was adequate where a witness against defendant had given a prior out-of-court inconsistent statement).

We also reject defendant's arguments that there were several errors in the jury charges, and in aggregate, those errors warrant a reversal. Defendant's argument relies on his contentions concerning the failure to give a limiting instruction under Rule 404(b) and the failure to give a specific charge concerning the use of inconsistent statements by Simmons. As we have rejected both of those arguments on their merits, cumulatively they do not establish a reversible error in the overall charge.

C.    Defendant's Right to a Speedy Trial

Before his trial, defendant twice moved to dismiss the charges against him, contending that his right to a speedy trial had been violated.  The trial court denied those motions.  Before us, defendant argues that the trial court erred and we should reverse the jury verdict based on a violation of his right to a speedy trial.  Having considered these arguments, we discern no error or abuse of discretion in the trial court's reasoning for denying both motions.

"The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and imposed on the states by the Due Process Clause of the Fourteenth Amendment."  State v. Tsetsekas, 411 N.J. Super. 1, 8 (App. Div. 2009) (citing Klopfer v. North Carolina, 386 U.S. 213, 222-23 (1967)).  "The constitutional right . . . attaches upon defendant's arrest."  Ibid. (alteration in original) (quoting State v. Fulford, 349 N.J. Super. 183, 190 (App. Div. 2002)).  The State has the duty to promptly bring a case to trial and it must avoid excessive delays.  Ibid.

The defendant bears the burden of establishing a violation of his or her speedy trial right.  Id. at 9.  In determining whether a defendant's speedy trial right has been violated, a court must consider and balance (1) the length of delay; (2) the reason for the delay; (3) defendant's assertion of his or her right to a

speedy trial; and (4) prejudice to defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972); accord State v. Szima, 70 N.J. 196, 200-01 (1976) (adopting the Barker analysis). "No single factor is a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial." Tsetsekas, 411 N.J. Super. at 10 (citing Barker, 407 U.S. at 533). Accordingly, courts are required to analyze each interrelated factor "in light of the relevant circumstances of each particular case." Ibid. The remedy for violation of the right to a speedy trial is dismissal of the indictment. Barker, 407 U.S. at 522.

We review a trial court's factual findings concerning a speedy trial issue under an abuse of discretion standard. See Fulford, 349 N.J. Super. at 195-96 (noting that this court "cannot conclude that [the trial judge] abused his discretion in rejecting defendant's speedy trial contention" (alteration in original)). In contrast, we review the trial court's legal analysis de novo. See State v. Handy, 206 N.J. 39, 45 (2011).

Here, it is undisputed that there was a substantial delay in bringing this case to trial and that defendant twice asserted his right to a speedy trial. The murder and robbery occurred on February 18, 2011. Defendant was arrested approximately one week later on February 25, 2011. He was indicted

approximately a year later, on May 8, 2012, and tried approximately four years later, in September and October 2015.

Defendant first moved for dismissal of the charges in 2012, before he was indicted. The court heard that motion and denied it on June 8, 2012. In making that ruling, the court noted the complex nature of the murder charge. In particular, the court relied on the State's representation that some of the key evidence required forensic analysis, which took time to conduct. The court also observed that the defense was not impaired by the delay because the defendant had the benefit of a pre-indictment probable cause hearing.

We discern no abuse of discretion in the trial court's denial of the first speedy trial motion. The evidence in the record supports the trial court's findings concerning the reasons for the delay. We also see no error in the trial court's legal analysis. See Handy, 206 N.J. at 45; Fulford, 349 N.J. Super. at 195-96.

Defendant made his second speedy trial motion in 2014. The trial court denied that motion after hearing oral argument on August 14, 2014. The trial court acknowledged that there had been a substantial delay in bringing the case to trial, but reasoned that a significant part of that delay was due to a change in position by Simmons. In 2013, Simmons had pled guilty and agreed to testify against defendant. Thereafter, however, Simmons withdrew his guilty plea and

the State was delayed in bringing about the trial because of that withdrawal. The trial court also found that some of the delay between 2012 and 2014 was attributable to defendant.

We also discern no abuse of discretion in the trial court's reasoning for denying defendant's second speedy trial motion. Significantly, the trial court found that the State's delay did not impair defendant's ability to defend himself. Consequently, the trial court held that defendant failed to meet his burden concerning the prejudice prong of the Barker test. See Barker, 407 U.S. at 530. Again, the record supports the trial court's factual findings concerning the reasons for the delay, and its legal reasoning was sound. See State v. Townsend, 186 N.J. 473, 486-87 (2006) (holding that an unexplained twenty-two month pre-indictment delay did not prejudice defendant); State v. Long, 119 N.J. 439, 471 (1990) (holding that a 971 day delay did not violate defendant's speedy trial rights); State v. Douglas, 322 N.J. Super. 156, 171 (App. Div. 1999) (holding that a three-year delay in a capital murder case did not prejudice defendant).

Needless to say, a murder investigation often involves complex issues that have to be carefully investigated, cross-checked, and analyzed. The record in this case does not demonstrate that the State deliberately delayed bringing defendant to trial. This case involved two co-defendants and the State spent

considerable time trying to negotiate a plea agreement with Simmons so that he could testify against defendant. There is no showing that the State was dilatory in engaging in negotiations with Simmons. To the contrary, Simmons initially pled guilty and then moved to withdraw that guilty plea. Those proceedings took a good deal of time to resolve and explain a substantial portion of the delay in bringing about defendant's trial. Critically, however, the delay was not prejudicial to defendant. While defendant obviously did not want Simmons to testify against him, a jury had the right to hear Simmons' testimony and evaluate it in light of the serious charges against defendant.

D. The Alleged Juror Misconduct.

We have already addressed defendant's juror misconduct arguments at length in a published opinion. Griffin, 449 N.J. Super. at 13. On this appeal, defendant does not make any new arguments concerning this issue. Instead, he raises this argument "for the sole purpose of preserving the issue in the event of further review." We, therefore, reject defendant's arguments concerning alleged juror misconduct for the reasons we have detailed in our earlier published opinion. Whether defendant can still appeal on that ground, we leave to our Supreme Court.

E. The Sentence.

Finally, defendant contends that his fifty-year sentence, subject to NERA, was manifestly excessive. He also argues that the sentencing court abused its discretion in imposing an extended term. We disagree.

We review sentencing decisions under an abuse of discretion standard. State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)). We will affirm a trial court's sentence unless "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent and credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" Bolvito, 217 N.J. at 228 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

The sentencing judge here properly determined that defendant was eligible for an extended term. In that regard, there is no dispute that defendant's prior convictions made him eligible for an extended term. The court reviewed defendant's prior convictions and noted that, although his prior sentences were probationary, there were a number of offenses. We discern no abuse of discretion in that analysis or the decision to impose a fifty-year prison term.

A-5665-16T4

A review of the record establishes that the sentencing judge also assessed the aggravating and mitigating factors and made findings, which are supported by the record. In that regard, the sentencing judge determined there were no applicable mitigating factors. N.J.S.A. 2C:44-1(b). The sentencing judge found aggravating factors two, the gravity and seriousness of the harm inflicted on the victim including whether defendant knew or should have known the victim was particularly vulnerable, N.J.S.A. 2C:44-1(a)(2); three, the risk defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3); six, the extent of the defendant's prior criminal record and the seriousness of those offenses, N.J.S.A. 2C:44-1(a)(6); and nine, the need for deterrence, N.J.S.A. 2C:44-1(a)(9). The sentencing court provided an adequate explanation in support of its findings and these findings were supported by evidence in the record. Consequently, we discern no abuse of discretion in the sentence imposed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5665-16T4